## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**KARL H. RUHLAND AND
KATRINA T. RUHLAND,**                         Chapter 7
　　　Debtors                                   Case No. 11-19510-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~

**FELIPE CHAVES, a/k/a
FELICIO VIEGAS de OLIVEIRA,[1]**
　　　Plaintiff
v.                                              Adv. P. No. 11-1322
**KARL H. RUHLAND**,
　　　Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

### I. INTRODUCTION

The matter before the Court is the Amended Complaint filed by Felipe Chaves

("Chaves" or the "Plaintiff") against Karl Ruhland (the "Defendant" or the "Debtor").

Through his Complaint, Chaves seeks to except from discharge a debt in an unspecified

amount pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).  The debt arises out of a judgment

the Plaintiff obtained against the Debtor for unpaid wages.

---

[1] On December 8, 2012, the Plaintiff informed his attorney that while he goes by
the name of Felipe Chaves his given birth name is Felício Viegas de Oliveira.  The
Plaintiff amended his Complaint on December 10, 2012 to reflect that name.

1

## II. BACKGROUND

The Debtor filed a voluntary Chapter 7 petition on October 5, 2011.  He listed the Plaintiff as the holder of an unsecured, nonpriority claim on Schedule F in the amount of $40,000.  The Chapter 7 Trustee filed a Report of No Distribution on December 9, 2011.  The Plaintiff timely filed a complaint to except his debt from discharge on November 6, 2011.

## III. FACTS

A. <u>Stipulated Facts</u>

Following a series of discovery disputes, the parties filed a Joint Pretrial Memorandum in which they agreed to a number of undisputed facts, which the Court repeats below.

The Debtor had a painting business and employed seasonal workers to complete exterior and interior painting jobs.  In or about January of 2006, the Attorney General for the Commonwealth of Massachusetts began an investigation of the Defendant for failure to pay his employees for work performed, failure to pay overtime, and failure to provide employees with proper pay stubs.  In or about September of 2006, the Defendant entered into an Agreement with the Attorney General to pay $16,733.50 in back wages to eight of his employees. As part of that Agreement, the Defendant agreed to comply with Massachusetts wage and hour laws, including those requiring payment of workers in a timely manner.

In or about November of 2006, after the execution of the Agreement, the Plaintiff and the Defendant entered into an employment agreement.  The Plaintiff promised to

perform painting services in exchange for the Defendant's promise to pay him an hourly rate of pay. The Defendant intended that the Plaintiff would rely upon his promise to pay an agreed upon rate for the Plaintiff's painting services. At the time the parties made their agreement, the Plaintiff's wife worked for the Defendant and his then spouse as a house cleaner.

The Plaintiff proceeded to perform painting services for the Defendant pursuant to the parties' agreement. He painted interiors and exteriors of houses for the Defendant, but the Defendant did not pay him on a regular weekly basis.

On multiple occasions, the Plaintiff asked for his pay and the Defendant told the Plaintiff "money soon," which was a representation that he intended to pay the Plaintiff in full. In or about March of 2007, the Plaintiff stopped working for the Defendant. Two months later, the Plaintiff went back to work for the Defendant as a result of the Defendant's promise to pay everything he owed the Plaintiff, and the parties agreed upon a wage rate that the Defendant would pay the Plaintiff.

In November of 2007, the Plaintiff again quit working for the Defendant. On multiple occasions after the Plaintiff stopped working for the Defendant, the Plaintiff called the Defendant to try to obtain the amounts due for his services to no avail.

In January of 2008, the Attorney General began another investigation of the Defendant for non-payment of wages. In November of 2008, the Attorney General issued a civil citation against the Defendant for failing to pay six employees, including the Plaintiff. The Attorney General ordered the Defendant to pay $19,402.00 in restitution to

3

his workers, as well as a $10,000.00 penalty to the Commonwealth of Massachusetts.  The

Defendant did not pay the amounts ordered by the Attorney General in November of 2008

or thereafter.

The Defendant initially obtained the Plaintiff's services by promising to pay for

them.  The Defendant intended that the Plaintiff would rely upon his promise to pay for

the Plaintiff's services.  As a result of reliance upon the Defendant's promises, the Plaintiff

suffered damages in the form of uncompensated time and labor.

On or about October 27, 2010, the Plaintiff filed a civil action against the Defendant

in the Malden District Court (Civil Action 2010-50-CV-1928).  On or about January 26, 2011,

the Malden District Court allowed the Plaintiff's motion to assess damages of $37,020.00,

litigation costs of $195.00, and attorney's fees of $1,080.00. The  court also entered a default

judgment in favor of the Plaintiff.  On or about February 8, 2011, the Malden District Court

issued an execution in the Plaintiff's favor, in the amount of $38,934.89.   Under

Massachusetts law, the Judgment has continued to accrue interest, at the annual rate of

twelve per cent.

On or about July 20, 2011, the Essex County Sheriff issued a check for $1,950.00 to

the Plaintiff, towards payment of the Judgment after seizing and auctioning a vehicle

belonging to the Defendant.  Apart from the payment from the Essex County Sheriff, the

Plaintiff has received no payments towards the Judgment.   Apart from the Plaintiff, the

Defendant did not list any of his former employees on the creditor matrix he filed in the

Chapter 7 Proceeding.  The Defendant also did not list the Attorney General on the

Creditor Matrix. The Defendant received a general discharge in the Chapter 7 Proceeding on January 10, 2012. The Attorney General did not file a complaint objecting to the Defendant's discharge or seeking to except his obligation to the Commonwealth from discharge. Similarly, no creditors, except the Plaintiff, filed adversary proceedings against the Debtor.[2]

B. Trial Testimony and Exhibits

At trial, four witnesses testified and four exhibits were admitted into evidence. The Plaintiff, a Portuguese speaker, testified through an interpreter.

Lillian Hirales, an Assistant Attorney General with the Fair Labor Division, testified that in her capacity as an assistant attorney general she enforced "the Commonwealth['s] wage and hour laws including statutes that involve overtime, minimum wage, and the timely payment of wages." She stated that she also participated in civil administrative hearings before the Division of Administrative Law Appeals, as well as criminal prosecutions of employers in court. She testified that wage complaints generally are received by her office through the mail, but some are referred through community-based workers' rights organizations.

Ms. Hirales testified that she worked with Joseph Hyacinthe, an investigator involved in examining the Debtor's employment practices. She reviewed his findings and

---

[2] To the extent that the Attorney General and employees with unpaid wage claims were not listed by the Debtor on his creditor matrix, and to the extent they lacked notice or actual knowledge of the Debtor's bankruptcy filing, their claims would not be discharged. *See* 11 U.S.C. § 523(a)(3). *See also* Colonial Surety Co. v. Weizman, 564 F.3d 526 (1st Cir. 2009).

interviewed the Plaintiff in 2008.

Ms. Hirales identified four documents which were subsequently admitted into evidence.  The first was a 2006 Agreement between the Office of the Attorney General and the Debtor, doing business as Ruhland Painting, which was undated.  The parties through their Agreement recognized that the Commonwealth, through the Office of the Attorney General, is charged with enforcement of "various Wage and Hours Laws, including but not limited to, the Commonwealth's Wage Payment Statute, G.L. c. 149, § 148, Overtime Law, G.L. c. 151, §§ 1A and1B and other related statutes and regulations."  They also recognized that the Debtor was a statutory employer of Ruhland Painting's employees pursuant to G.L. c. 149 and c. 151.   In addition, the three-page Agreement set forth the results of an investigation conducted by the Attorney General.  Specifically, it provided:

> Beginning in January 2006, in response to employee complaints, the Attorney General undertook an investigation of Karl Ruhland's employment and wage payment practices, during April 2005 through September 2006.  As a result of the investigation, the Attorney General determined that Karl Ruhland failed to timely pay wages, failed to provide employees with a suitable pay stub, and failed to pay overtime pay at a rate of one and one half times the employees' regular hourly rate, in violation of G.L. c. 149, § 148 and c. 151, §§ 1A-1B, to certain employees identified in the attached "Exhibit A." Additionally, during August 2005, Karl Ruhland issued paychecks to employees which were returned for insufficient funds, and he did not provide the value of those checks to the affected employees at any time after receiving notice that the checks were dishonored, in violation of G.L. c. 266, § 37.  The Attorney General further determined that Karl Rhuland failed to maintain workers compensation insurance coverage during April 2005 through September 2005, in violation of G.L. c. 152, § 25C.

In the Agreement, the Debtor represented that he wished "to resolve fully and finally any and all claims that may be brought by the Attorney General" and accordingly agreed "to

6

remit a total of $16,733.50 in restitution, representing straight wages and overtime pay due to the employees identified in the attached 'Exhibit A,' through payments made in three installments." The three installment payments in the approximate amount of $5,600 were due, in the form of a certified check or money order, at the time of the execution of the Agreement, on or before August 16, 2007, and on or before September 17, 2007.

In addition to making payments, the Debtor agreed to waive the statute of limitations as a defense for the Overtime Law violations should he fail to fulfill his payment obligations. Furthermore, he agreed that, if he breached the Agreement, the Attorney General could "pursue any and all remedies available for violations occurring during the period of April 2005 through September 2006 relating to the wages earned by the employees identified in the attached 'Exhibit A,' including, but not limited to, instituting any civil or criminal enforcement, or any action to enforce this agreement."

The Debtor, pursuant to Paragraph H of the Agreement, agreed "to prospectively pay his workers in a timely manner, provide them with suitable pay stubs, and to pay overtime pay, as required by law, and to comply with the record-keeping requirements contained in G.L. c. 149, §§ 148 and 150A and G.L. c. 151, § 15. . . ." Finally, the Debtor agreed that

> [b]y entering into this Agreement, Karl Ruhland admits that this Settlement Agreement shall serve as evidence of nonwillful civil violations of G.L. c. 149, § 148, and G.L. c. 151, §§ 1A-1B, pursuant to G.L. c. 149, § 27C(b)(1), admissible in any subsequent proceedings against him, and companies wherein he acts as a manager, director, principal, or partner of any enterprise that employs individuals, and any business, company, enterprise or venture in which he has an ownership or controlling interest, or of which he is a

7

> principal, manager, director or partner, or of which he is the beneficial owner of more than 20% of the stock or property thereof, or in which he has any managerial, operating, or supervisory role, whether official, unofficial, named or hidden.

Ms. Hirales testified that the Debtor complied with the Agreement and made the required payments.

Ms. Hirales also identified a Non-Payment of Wages and Workplace Complaint filed by the Plaintiff on January 28, 2008. The Complaint was originally prepared in Portuguese by the Plaintiff and later translated and typed by a member of the Attorney General's office. The Plaintiff indicated that he had commenced working for Ruhland Painting on October 15, 2006 and terminated his employment on November 18, 2007. The Plaintiff set forth in the Complaint that he had requested the Debtor to pay his wages for which he received the following response: "He did not have money." The Plaintiff also indicated that he went to the police, adding that "He always says that he will give the money, but now he doesn't answer the phone." Additionally, in the Complaint, he stated that his rate of pay was $1,000 per week and that he was owed $12,600. He also stated that the Debtor "would say he would cash the check but he would never pay, then he would say he did not have money or that he would pay the following week, but he would never give it to me." The Plaintiff attached an itemization to his Complaint reflecting the following:

| November | 2006-2 weeks=40 Hours |
| December | 2006-2 weeks=40 Hours |
| January | 2007-3 weeks=60 Hours |
| February | 2007-3 weeks=40 Hours |
| | |
| Total: | 180 Hours |

8

180 x 12=Total owed:        $2,160

March & April-I did not work

May, June, July, August & September = $1,000 per week

|  |  |
|---|---|
| Total Amount: | $16,000.00 |
| Amount Received: | $10,000.00 |
| Total Owed: | $  6,000.00 |

| October- | $4,000.00 | | Total | $6,000 |
|---|---|---|---|---|
| November- | $2,000.00 | | Received | $2,000 |
| | | | Remaining Owed: | $4,000.00 |

December-I did not work

Total amount owed:        6,000.00 + 4,000.00 + 2,160.00 =    $12,160.00

Ms. Hirales also testified about a "Citation for Violation of Massachusetts Wage and Hour Laws" issued by the Office of the Attorney General, Fair Labor Division, on November 26, 2008.  The Citation contained an order requiring the Debtor to pay restitution of $19,402.00 and a civil penalty of $10,000.  It set forth an *intentional* violation of Mass. Gen. Laws ch. 149, § 148 for failure to make timely payment of wages due and owing to six employees, including the Plaintiff who was owed $12,600 from November 2006 to November 2007.  The Citation was signed by Joseph Hyacinthe.

The second page of the Citation set forth payment instructions, information about failure to comply with the Citation, and information about the right to appeal the issuance of the Citation.  With respect to the failure to comply, the Citation set forth the following:

In accordance with Massachusetts General Law chapter 149, sections 27C(b)(6) and (7), failure to pay any civil penalty within 21 days of receipt of this citation <u>will</u> result in a one year debarment from bidding on public

works projects and a lien for the amount of such penalty and any restitution
ordered, plus 18% interest upon the real estate or personal property of the
person who has failed to pay such penalty and may result in a criminal
prosecution and/or stop work order unless a notice of appeal has been filed
with the Attorney General and the Division of Administrative Law Appeals
within 10 days of receipt of this citation.

(emphasis in original).  In addition, the Citation provided:

This citation contains an order for you to rectify all infractions immediately
and to comply with all provisions of Massachusetts General Laws Chapters
149 and 151.  In order to fully comply with this order you must familiarize
yourself with your legal obligations as an employer in Massachusetts.  A
subsequent violation of Massachusetts wage and hour law may result in your
being charged as an intentional or willful subsequent offender.

As noted above, the Debtor never paid any of the amounts set forth in the Citation.

The Plaintiff, a native of Minas, Brazil, who has a fifth grade education, testified that

he has been employed as a painter for twelve years.  Although he indicated that he speaks

some English, he stated that he is not fluent in the language.  The Plaintiff testified that he

worked for the Debtor on two occasions, having met him through his spouse, Marina

Simone Pimental who worked as a house cleaner for the Debtor's former spouse.  The

Plaintiff indicated that he began working for the Debtor as a house painter on the day he

met him in Ipswich, Massachusetts.  According to the Plaintiff, the Debtor stated that he

would pay him $12 per hour and that he would be paid weekly.

The Plaintiff further testified that he and Ruhland painted the interior and exterior

of homes in Concord, Massachusetts.  The Plaintiff, who moved to Ipswich where the

Defendant resided, began work between 6:00 a.m. and 7:00 a.m. and that the Debtor would

pick him up at his house and drive him to job sites.  The Plaintiff's cousin also worked for

10

the Debtor, as well as several other individuals.  According to the Plaintiff, Ruhland would

sometimes paint with his crew or hang wallpaper.

The Plaintiff testified that he worked between 30 and 40 hours per week.  He

indicated that he wrote down the number of hours he worked and that, when asked, the

Debtor told him he was keeping track of the Plaintiff's hours on his cell phone.  The

Plaintiff added that he kept his notes of the hours he worked on his refrigerator door.

The Plaintiff stated that Ruhland paid him for his first week of work but failed to pay him

regularly thereafter.  He asked the Debtor every week to pay him but the Debtor would say

"money after."  The Plaintiff would sometimes bring his wife with him to speak with the

Debtor because his wife spoke English.  Although the Debtor would sometimes give the

Plaintiff some money "he would never be updated."  Eventually, the Plaintiff quit,

although he continued to call the Debtor in an attempt to get paid.  The Plaintiff stated that

the Debtor always said that "he was going to pay me and even set place [sic] for us to meet.

I would always go there, but he wouldn't show up."

Eventually, in May of 2007, the Plaintiff returned to work for the Debtor based on

the Debtor's representations that he would give the Plaintiff part of what was owed,

namely $2,000, and pay him $1,000 per week.  Although the Plaintiff doubted Ruhland's

word, he stated that he didn't have any other options.  The Plaintiff stated that he did not

have an automobile which prevented him from obtaining other employment.

The Plaintiff also testified that the Debtor asked him to "bring more people" as

potential workers.  According to the Plaintiff, he found five additional individuals willing

11

to perform painting services for the Debtor.  The Plaintiff stated that the Debtor still did not pay him regularly and would sometimes pay him for one week, although he had worked for three weeks.

Because of the Debtor's failure to pay the wages he was owed, the Plaintiff quit for a second time.  The Plaintiff continued to attempt to collect the money owed to him. According to the Plaintiff, the Debtor complained that "he was going through a difficult time in his life, that he was separating from his wife."  The Plaintiff eventually contacted the Ipswich, Massachusetts police, who informed him that he would have to bring his case to court.  The Plaintiff then went to the Brazilian Immigrant Center where he was given a Non-Payment of Wages and Workplace Complaint Form, which his wife completed in Portuguese on his behalf while he dictated the answers to the questions on the form.

The Plaintiff never went back to work for Ruhland after November 2007, although he was in contact with Ruhland after he filed the Complaint against  him.  The Plaintiff testified that he never received any money from the Debtor after he filed the Complaint and that he never received any money from the Commonwealth.

The Plaintiff testified that he observed Ruhland receiving checks from homeowners, although Ruhland refused to pay him in full after receiving the money.

The Plaintiff's wife of ten years, Ms. Pimental, also testified.  She indicated that she speaks English reasonably well but felt more comfortable testifying in Portuguese.  Ms. Pimental testified that although she was employed as a house cleaner for the Debtor's former wife, her services were terminated because of her husband's dispute with the

Debtor.  Ms. Pimental recounted a conversation in which the Debtor refused to pay the

Plaintiff because he was separating from his wife and going through a crisis.  Ms. Pimental

testified that she told the Debtor that she and her husband needed the money because they

were going to have a baby but the Debtor did not pay the Plaintiff.

The Debtor was the final witness to testify.  He stated that he had been a painter all

his professional life and that he owned his own company, a sole proprietorship.  He

indicated that he had not had a checking account since 2005 and that the last account he

had was closed because he had written insufficient funds checks, including insufficient

funds checks to his employees.  The Debtor stated that he employed the Plaintiff in October

of 2006 after he had been investigated by the Fair Labor Division of the Attorney General's

Office and executed the Agreement pursuant to which he promised to make restitution in

the amount of $16,733.50.  The Debtor admitted that at the time he executed the Agreement

he understood that Massachusetts law required him to pay his employees within one week

of the pay period, to pay them overtime, and to provide them with pay stubs.  He further

admitted that after he hired the Plaintiff he failed to abide by the terms of the Agreement

with the Commonwealth.

The Debtor also admitted that he was paid by his customers for painting services.

In addition, he admitted that the house that he lived in was in his former wife's name and

that she was the sole obligor on the mortgage.  Additionally, he admitted that she made the

monthly mortgage payments and paid the real estate taxes, as well as the utilities and

household bills, although he insisted that he gave her money.  He further admitted that he

13

had no record of how much money he gave her and that he had no creditors.

The Debtor testified that he received the Citation from the Attorney General's Office and did not appeal it. He stated:

> The numbers weren't true but I wasn't in a position to fight it. The numbers were all inflated but it wasn't wise for me to fight it because I had done it before, so I didn't agree with the numbers but I was in no position to fight it because I had not kept records and the men who were working for me were illegal so I had made a mistake and I had no recourse but to accept what they said.

The Debtor also admitted that when the Plaintiff ceased working for him in November of 2007, he knew he owed the Plaintiff money.

The Debtor explained that his business was seasonal and that he might have two or three guys working for him for some periods and not others. He did not remember his weekly income or even his annual income, although he testified that he was not making enough money to cover his expenses. At a deposition, however, he testified that his mistake was "[p]robably hiring unskilled labor." The Debtor also did not remember the Plaintiff's name, except a nickname, how long he employed the Plaintiff, or the hourly wage he agreed to pay the Plaintiff. The Debtor also stated: "He [the Plaintiff] was a nice guy. He rode to work with me every day, so obviously I liked him."

Although the Debtor stated that he wrote down "what the guys did," he didn't have the records anymore. Additionally, he testified that he did not provide the Plaintiff with pay stubs "because I knew he was not legal - - a legal resident." The Debtor admitted that he did not abide by the terms of his Agreement with the Attorney General going forward

as he did not give his employees pay stubs or pay them in a timely manner.

On cross-examination, the Debtor testified that when he employed the Plaintiff he

believed that he would be able to pay him.  He stated the following:

> I had some contracts lined up and I thought we would get the work done in
> a timely fashion to be able to pay him, but we fell behind often. My fault. I
> was the manager of the company. I just didn't charge enough for the work
> we were doing. I think that was the root of the problem.

The Debtor attended college for four years, although he did not graduate, and took

business and accounting courses.  The Debtor testified that he had no reason to cause the

Plaintiff harm.  He added:

> The problem was because I was so desperate for work, we would work cheap
> and there was never enough money. By the time I finished paying my bills,
> I wouldn't have enough to pay the men. I paid them what I could.
>
> ***
>
> When I took a bid on a job, I would estimate that it would take a few weeks.
> Sometimes I'd be off. Instead of taking two weeks, it would take three weeks
> and that would be the problem.

The Debtor also testified that he should have let the Plaintiff go before he ran out of work.

He stated:  "The problem was, I was  - -  just kept him too long. I should have when the

money got tight, let him go - - paid him and let  him go."  He concluded:  I've never had

any problems with my employees being bad guys because I spend time with them.  And

I never not paid anyone [sic] because they weren't nice guys.  I wasn't paying each other

[sic] is because of bad business."

The Debtor's testimony unequivocally established that he exploited the Plaintiff to

obtain the proceeds from painting contracts which he used for his personal expenses

instead of paying the Plaintiff his wages.  He did so in knowing disregard of Massachusetts

law and his obligations under the Agreement he executed with the Attorney General.  The

Debtor failed to establish in any meaningful way how he spent the revenue generated from

painting contracts  other than stating that he gave his spouse money.  Accordingly, the

record permits the inference that the money he obtained through his business activities

could have been used to pay business expenses or for entertainment.

## IV. DISCUSSION

Section 523(a)(6) excepts from discharge debts resulting from "willful and malicious

injury by the debtor to another entity or to the property of another entity."  11 U.S.C. §

523(a)(6). *See* Kawaauhau v. Geiger, 523 U.S. 57, 60-61 (1998).   Like other exceptions to

discharge, it must be proven by a preponderance of the evidence.  Grogan v. Garner, 498

U.S. 279, 286-88 (1991).  This Court recently examined case law under § 523(a)(6) in

Trenwick Am. Reinsurance Corp. v. Swasey (In re Swasey), No. 12-1040,  2013 WL 593699

(Bankr. D. Mass. Feb. 14, 2013).  The Court will not repeat that detailed discussion here.

As this Court stated in Bauer v. Colokathis (In re Colokathis), 417 B.R. 150, 158-59 (Bankr.

D. Mass. 2009),

> Construing Geiger and Printy together this Court concludes that, for an
> exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the creditor has
> the burden of showing by a preponderance of the evidence, *see* Grogan v.
> Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), that 1) the creditor
> suffered injury; 2) the debtor intended to cause the injury or that there was
> substantial certainty that the injury would occur; and 3) the debtor had no
> justification or excuse for the action resulting in injury. This is consistent with

16

the <u>Slosberg</u> court's view that although "the terms [willful and malicious]
might share elements, i.e., they both require that the act itself be intentional,
they must have independent significance. <u>In re Geiger</u> should not be read to
collapse the two elements into one." <u>Slosberg</u>, 225 B.R. at 19–20 (citations
omitted).

<u>Id.</u> at 158-59 (citing <u>Geiger</u>, 523 U.S. at 61 ("The word 'willful' in (a)(6) modifies the word

'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not

merely a deliberate or intentional act that leads to injury."); <u>Printy v. Dean Witter Reynolds,</u>

<u>Inc.</u>, 110 F.3d 853 (1st Cir.1997) (a malicious injury is one that is "wrongful and without

just cause or excuse"); and <u>McAlister v. Slosberg (In re Slosberg)</u>, 225 B.R. 9 (Bankr. D. Me.

1998)).  <i>See also</i> <u>In re Swasey</u>,  2013 WL 593699 at *14-16.

In the present case, the Court finds that the Plaintiff suffered injury as a result of the

Debtor's willful conduct and that conduct was malicious as it was without justification or

excuse.  The Debtor injured the Plaintiff by inducing him to perform painting work for

substantially less than the value of those services, in  willful and knowing violation of

Massachusetts law, and with knowledge that injury to the Plaintiff was substantially

certain to result.

To establish willfulness, the Plaintiff was required to prove that the Debtor intended

to cause injury to the Plaintiff or the Debtor acted in a manner that he knew or was

substantially certain would harm the Plaintiff.  <i>See</i> <u>In re Slosberg</u>, 225 B.R. at 19 ("a debtor

who intentionally acts in a manner he knows, or is substantially certain, will harm another

may be considered to have intended the harm and, therefore, to have acted willfully within

the meaning of § 523(a)(6).").  The Court finds that the Plaintiff satisfied that burden.

In rejecting any notion that he intended to injure the Plaintiff, the Debtor points to his testimony that the Plaintiff was "a nice guy" and that he liked the Plaintiff. Of course, that testimony must be juxtaposed against the Debtor's admission that he could neither remember the Plaintiff's name nor that of his spouse. More importantly, the Court concludes, for the reasons set forth below, that the Debtor's testimony that he liked the Plaintiff is irrelevant to the analysis under § 523(a)(6).

In Petralia v. Jercich (In re Jercich), 238 F.3d 1202 (9th Cir. 2001),[3] the United States Court of Appeals for the Ninth Circuit considered whether a judgment obtained by the plaintiff for unpaid wages was excepted from discharge under § 523(a)(6) where a state court had determined the following:

> Jercich [the Debtor] had not paid Petralia [the Plaintiff] commissions and vacation pay as required under the employment contract; that "Jercich had the clear ability to make these payments to Petralia, but chose not to"; that instead of paying Petralia and other employees the money owed to them, "Jercich utilized the funds from his company to pay for a wide variety of personal investments, including a horse ranch"; and that Jercich's behavior was willful and amounted to oppression within the meaning of California Civil Code § 3294. The state court held, in relevant part, (1) that Petralia was entitled to his unpaid wages; (2) that Jercich owed Petralia waiting time penalties; and (3) that because Jercich's failure to pay was willful and deliberate and "constituted substantial oppression," punitive damages would be assessed against Jercich in the amount of $20,000.00. The state trial court's judgment against Jercich was affirmed by the California Court of Appeal in an opinion filed in May 1986.

238 F.3d at 1204 (footnote omitted). The Ninth Circuit stated: "[A]lthough § 523(a)(6)

---

[3] *See* Carrillo v. Su (In re Su), 290 F.3d 1140 (9th Cir.2002), in which the United States Court of Appeals for the Ninth Circuit clarified its interpretation of the "willful" standard.

18

generally applies to torts rather than to contracts and an intentional breach of contract generally will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6)." Id. at 1205 (footnotes omitted). The court stated: "to be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.'" Id. at 1206. The Ninth Circuit examined the circumstances giving rise to the plaintiff's claim and stated that "[u]nder California law, '[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort laws.'" Id. at 1206 (footnote omitted). The court added: "tort recovery for the bad faith breach of a contract is permitted only when, 'in addition to the breach of the covenant [of good faith and fair dealing] a defendant's conduct violates a fundamental public policy of the state.' The California Court of Appeal has held that 'the prompt payment of wages due an employee is a fundamental public policy' in California." Id. (footnote omitted).

The Jercich decision provides guidance in this case. Under Massachusetts law, "[c]ontracts for employment . . . contain 'an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of the contract.'" Sands. v. Ridefilm Corp., 212 F.3d 657, 662 (1st Cir. 2000) (citing Fortune v. National Cash Register Co., 373 Mass. 96, 101, 364 N.E.2d 1251 (1977)). The court in Christensen v. Kinston School Committee, 360 F. Supp. 2d 212 ( D. Mass. 2005), observed, however, that

19

"not every breach of contract is a breach of the implied covenant of good faith and fair dealing," adding "recovery under the latter theory requires conduct taken in bad faith either *to deprive a party of the fruits of labor already substantially earned* or unfair leveraging of the contract terms to secure undue economic advantage." Christensen, 260 F. Supp.2d at 226 (emphasis supplied) (citing Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991)). Thus, [h]arms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented-or at a minimum diverted-the injured parties from seeking immediate redress." Id. at 226 (citing Boston Pilots v. Motor Vessel Midnight Gambler and E. Coast Excursions, Inc., 357 F.3d 129, 135 (1st Cir. 2004)).

In the instant case, the Debtor by acting deceitfully and unfairly breached the covenant of good faith and fair dealing in his contract with the Plaintiff. Deceit is a tort and "a variety of fraud." Cummings v. HPG. Internat'l, Inc., 244 F.3d 16 (1st Cir. 2001). Noting confusion in Massachusetts case law, the United States Court of Appeals for the First Circuit utilized the definition of deceit found in the RESTATEMENT (SECOND) OF TORTS § 526:

> A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

244 F.3d at 23. The court added:

> "Knowledge" for the purpose of showing fraud is established by any of these three conditions. A claim of deceit has been categorized as an intentional tort,

> Mohr v. Com., 421 Mass. 147, 653 N.E.2d 1104, 1115 n. 16 (1995); G & B
> Assoc. v. Springfield, 39 Mass. App. Ct. 51, 653 N.E.2d 203, 205 (1995). . . . A
> defendant who makes a false statement may be liable for deceit if he
> implicitly conveyed that he had knowledge of the represented fact. *See*
> McEneaney, 650 N.E.2d at 96; Restatement (Second) of Torts § 526.

Id. The parties stipulated that the Debtor represented that he intended to pay the Plaintiff

in full.   The Court finds that when the Debtor on multiple occasions made those

representations he could not have been made them with any confidence of their accuracy.

The Debtor did not maintain a checking account because of his history of insufficient funds

checks; he admitted that he could not produce pay stubs or other contemporaneous records

of what he owed the Plaintiff and other employees.  His promises were made to induce the

Plaintiff to continue working for him.  The Plaintiff's testimony shifted the burden to the

Debtor to establish that he, at the least, had the confidence in the accuracy of his

representations that he stated or implied.  He did not satisfy that burden.

In addition to the Debtor's deceitful and unfair conduct, like California,

Massachusetts has laws and a strong public policy regarding the prompt payment of

wages.  *See* Mass. Gen. Laws ch. 149, § 148.[4] According to the court in Boston Patrolmen's

---

[4] Section 148 provides in pertinent part:

Every person having employees in his service shall pay weekly or
bi-weekly each such employee the wages earned by him to within six days
of the termination of the pay period during which the wages were earned
if employed for five or six days in a calendar week, or to within seven
days of the termination of the pay period during which the wages were
earned if such employee is employed seven days in a calendar week, or in
the case of an employee who has worked for a period of less than five
days, hereinafter called a casual employee, shall, within seven days after
the termination of such period, pay the wages earned by such casual

<u>Ass'n, Inc. v. City of Boston</u>, 435 Mass. 718, 720 (2002), the purpose of ch. 149, § 148, the

weekly wage law, is "to prevent the unreasonable detention of wages."  The law places a

---

> employee during such period, but any employee leaving his employment
> shall be paid in full on the following regular pay day, and, in the absence
> of a regular pay day, on the following Saturday;  . . .
>
> ***
>
> Whoever violates this section shall be punished or shall be subject to a
> civil citation or order as provided in section 27C.

Mass. Gen. Laws ch. 149, § 148.  Section 27C in pertinent part provides:

> (a)(1) Any employer, contractor or subcontractor, or any officer, agent,
> superintendent, foreman, or employee thereof, or staffing agency or work
> site employer who willfully violates any provision of section 26, 27, 27A,
> 27B, 27F, 27G, 27H, 148, 148A, 148B or 159C or section 1A, 1B or 19 of
> chapter 151, shall be punished by a fine of not more than $25,000 or by
> imprisonment for not more than one year for a first offense, or by both
> such fine and imprisonment and for a subsequent willful offense a fine of
> not more than $50,000, or by imprisonment for not more than two years,
> or by both such fine and such imprisonment.
>
> ***
>
> (6) If any person shall fail to comply with the requirements set forth in any
> order or citation issued by the attorney general hereunder, or shall fail to
> pay any civil penalty or restitution imposed thereby within 21 days of the
> date of issuance of such citation or order or within 30 days following the
> decision of the hearing officer if such citation or order has been appealed,
> excluding any time during which judicial review of the hearing officer's
> decision remains pending, said attorney general may apply for a criminal
> complaint or seek indictment for the violation of the appropriate section of
> this chapter.

Mass. Gen. Laws ch. 149, § 27C.

duty on employers to pay wages and keep records. "[T]he right to timely payment of wages is a distinct, independent statutory right that can be enforced judicially even though the subject matter of overtime, call-back, and stand-by pay is incorporated in the plaintiffs' collective agreement." Newton v. Commissioner of Dep't of Youth Servs., 62 Mass. App. Ct. 343, 816 N.E. 2d 993, 996 (2004). As the court in Jercich, noted: "Wages are not ordinary debts. Because of the economic position of the average worker and, in particular, his family, it is essential to the public welfare that he receive his pay promptly. Thus, the prompt payment of wages serves society's interest through a more stable job market, in which its most important policies are safeguarded." 238 F.3d at 1207.

In the instant case, the Court credits the Plaintiff's testimony. He witnessed the Debtor's receipt of checks from homeowners for whom Ruhland's sole proprietorship had performed painting services. The Debtor had the ability to pay the Plaintiff for the work he performed but elected instead to use the money to benefit himself personally in other ways. The Debtor did not explain what his expenses were and produced no evidence to corroborate their payment. Rather than terminate the Plaintiff as an employee, he chose to retain him, inducing his cooperation with empty promises of payment "soon" or intermittent payments which never fully satisfied the Plaintiff's outstanding wages, all in a knowing violation of Massachusetts law. The Debtor obtained the Plaintiff's services for far less than what he had promised to pay him, taking advantage of his status as an undocumented worker, lacking English language skills and an automobile. In effect, the Debtor stole the value of Plaintiff's services, gambling that his illegal conduct would not

23

be brought to the attention of the Attorney General because of the Plaintiff's status as an undocumented worker. The Court infers from the evidence presented that the Debtor chose a course of conduct to evade detection of wage law violations and exploited the Plaintiff to obtain money from painting jobs with no intention or ability to satisfy his obligations to the Plaintiff or the Attorney General.

The willfulness of the Debtor's conduct is apparent from circumstantial evidence. In the first place, the Debtor, prior to employing the Plaintiff, had been investigated by the Attorney General's Fair Labor Division and had agreed "to prospectively pay his workers in a timely manner, provide them with suitable pay stubs, and to pay overtime pay, as required by law, and to comply with the record-keeping requirements contained in G.L. c. 149, § 148 and 150A and G.L. c. 151, § 15, and all other employment related provisions, both state and federal. . . ." Rather than comply with his representations to and Agreement with, the Attorney General and applicable Massachusetts labor laws, the Debtor had another plan: employ an undocumented worker with a limited education, who would be unlikely to complain to the Fair Labor Division. And better yet, encourage the Plaintiff to find friends or relatives to work for him under similar circumstances. Through this course of action, the Debtor, who did not maintain a checking account, intentionally avoided the requirements of Mass. Gen. Laws ch. 149, § 148 and, ideally, detection resulting from the violations of those requirements. The Debtor did not pay his employees as required, did not provide them with pay stubs, and did not maintain records. He conceded he could not contest the Plaintiff's claims as to the amount of unpaid wages. Under the circumstances

24

of this case, the Court rules that the Debtor's conduct was willful.  There can be no doubt

that he knew that his nonpayment of wages would be substantially certain to harm the

Plaintiff.  Given the Plaintiff's repeated requests for his pay, the substantial amount of

wages in arrears, the Debtor's history of wage law violations, and the absence of any

credible explanation for the failure to pay the Plaintiff, the Court finds the Debtor

specifically intended to injure the Plaintiff.

With respect to the independent requirement of malice, the United States Court of

Appeals for the First Circuit in Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853 (1st Cir.

1997), adopted the following definition:

> To fall within the exception of section 523(a)(6), the injury to an entity or
> property must have been willful and malicious. An injury to an entity or
> property may be a malicious injury within this provision if it was wrongful
> and without just cause or excuse, even in the absence of personal hatred,
> spite or ill-will.

110 F.3d at 859.[5]  The Debtor proffered no just cause or excuse for his failure to pay the

---

[5] Although the First Circuit's formulation of the test for "willfulness" was
overruled by the Supreme Court's decision in Geiger, its formulation of the test for
malice was unaffected by Geiger.  As this Court noted in Gomes v. Limieux (In re
Limieux), 306 B.R. 433 (Bankr. D. Mass. 2004),

> The Slosberg court describes one legacy of the Geiger decision's silence
> on the term "malice" as an invitation to some observers to collapse the
> two modifiers of "wilful" and "malice" into a single legal construct.
> Slosberg, 225 B.R. at 20, n. 15. In fact, certain decisions outside the First
> Circuit have done just that; informed by both Geiger and the Restatement
> (Second) of Torts, § 8A (1964), they have unified "wilful and malicious"
> under § 523(a)(6) to mean any act in which the actor desires to cause the
> injury or believes with substantial certainty that the injury will occur. See
> Miller v. J.D. Abrams, Inc. (In re Miller), 156 F.3d 598, 606 (5th Cir.1998)
> (holding that "[a]ggregating 'wilful and malicious' into a unitary concept

25

Plaintiff and the willful injury he caused the Plaintiff.  The Debtor's testimony was marked by inconsistency and evasions.  For example, he testified that "in the winter there's never work in my business so I probably planned on hiring him for the summer and then not used him in the winter, but paying in full before he left."  The testimony is revealing because the Debtor hired the Plaintiff in October, even though he would have had at most two months to paint outdoors.  Moreover, his statement that he intended to pay the Plaintiff in full before he left was incredible.  His statements that his inability to pay the Plaintiff was the result of underbidding jobs was insufficient to rebut the evidence presented by the Plaintiff.  The Debtor was paid for the painting services he performed, yet he elected to use the money he received for purposes other than the payment of the Plaintiff with knowledge that injury to the Plaintiff was substantially certain to occur.

---

might be inappropriate if the word they modified were 'act,' but treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is 'injury.'"); Baldwin v. Kilpatrick (In re Baldwin), 245 B.R. 131, 136 (9th Cir. BAP 2000); (holding that "unless 'the actor desires to cause consequences of his act, or . .. believes that the consequences are substantially certain to result from it,' . . . he has not committed a 'wilful and malicious injury' as defined under § 523(a)(6)" (citing to Restatement (Second) of Torts, § 8A (1964) (internal citations omitted))); Harry Ritchie's Jewelers, Inc. v. Chlebowski (In re Chlebowski), 246 B.R. 639, 644 (Bankr. D. Or. 2000) (describing the effect of the Miller decision as creating "an integrated standard for determining whether an act is 'wilful and malicious'").

Limieux, 306 B.R. at 440 n.7.

The Debtor admitted that at the time he employed the Plaintiff he had no creditors. Although he stated that he gave money to his spouse, he had no records of how much money he contributed to household expenses. Indeed, the Debtor introduced no evidence whatsoever that he had insufficient money to pay the Plaintiff his wages. He failed to establish how much money he may have given his former wife who owned the property they shared and was solely liable on the mortgage. In addition, the Debtor testified that the only significant debt listed on his bankruptcy petition was the debt to the Plaintiff.

## V. CONCLUSION

Although there are decisions in which courts have held that nonpayment of wages does not give rise to a nondischargeable debt under § 523(a)(6), *see* Orr v. Marcella (In re Marcella), 463 B.R. 212 (Bankr. D Conn. 2011) (distinguishing Jercich), this Court's decision is consistent with the Ninth Circuit's decision in Jercich due to the presence of a knowing breach of the duty of good faith and fair dealing and tortious conduct on the part of the Defendant. *See also* Zamora v. Jacobs (In re Jacobs), 448 B.R. 453 (Bankr. N. D. Ill. 2011). In view of the foregoing, the Court shall enter a judgment in favor of the Plaintiff and against the Defendant. Because the Court has excepted the Plaintiff's state court judgment from discharge pursuant to 11 U.S.C.§ 523(a)(6), the Court need not address the Plaintiff's contention that the debt is also excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

By the Court,

Joan N. Feeney

Joan N. Feeney
United States Bankruptcy Judge

Dated:  March 13, 2013

27